*740 Statement of the Case.
MONROE, J.
This is a suit by some of the children and grandchildren of I-Iomer Gonsoulin and Odile Prince, his wife, both deceased, in which they attack a sale, or pretended sale, made by said Gonsoulin to the defendant, who was his son, and is the brother, uncle, and coheir of the plaintiffs. The causes of action set up in the petition, in the alternative, are that the transaction complained of was a fraudulent simulation, or a donation in disguise, or a sale at a low price which gave the vendee an advantage; and plaintiffs allege, among other things:
“That their said common ancestor, Homer Gonsoulin, at the time of the passing of said pretended sale, was in a very feeble condition, mentally and physically, and was totally unable to realize what he was about doing; and that he was unlawfully and wrongfully, influenced by the said Aptoine Gonsoulin to sign said pretended sale; that no money or consideration was ever paid therefor, either before, at the time,' or since the passing of said pretended sale; and that the said Homer Gonsoulin remained in actual and full possession and control of said property until his death.”
Counsel for plaintiffs now say in their brief:
“We desire, at the outset, to dismiss from consideration in this case any fact or law in connection with the allegations in the petition relative to simulation or to a ‘donation in disguise.’ We will argue this case solely on the article 1248 of the Revised Civil Code,” etc.
The facts, as we find them, are as follows: Mrs. Odile Prince, wife of Homer Gonsoulin, and mother and grandmother of the plaintiffs and defendant herein, died in April, 1907, leaving a small estate, of which the largest asset was a debt due by the community amounting to, say, $1,062, and leaving 11 or 12 children, issue of her marriage, or their representatives. She and her husband (all of the children save, perhaps, Gabriel, plaintiff herein, and Antoine, the defendant, having married and moved away) were living, at the time of her death, in the Eausse Point section of Iberia parish, upon a tract of 109 arpents of land which was the separate property of the husband, and they had lived there for many years, though they each owned other tracts of greater or less value. The community debts, exclusive of that due to the estate of the wife, amounted to some $600 or $700, and the surviving husband borrowed from the defendant (who, in consequence of his father’s failing health and partial loss of sight, had, for some years, assisted him in attending to his business) $1,000, upon a mortgage upon the home place, and used the money in paying them, and otherwise for his own purposes. It is testified by several witnesses that Mr. Gonsoulin stated that some of the heirs of his wife were pressing him for the payment of the amounts due them from their mother’s estate, and there is no doubt that, during the year 1908, he announced his intention of selling the home place in order to obtain the money wherewith to pay them, saying, at the same time, that he intended, in so doing, to reserve to himself the usufruct of the place during the balance of his life. Defendant testifies that his father first offered the property, at $20 an arpent, subject to the reservation mentioned, to the plaintiff Gabriel, and that the offer was refused; but that testimony is in conflict with the testimony of plaintiff. Defendant also testifies that his father then made the same offer to Mr. Gallier, a son-in-law, who, with his wife, had moved to the home place after the death of Mrs. Gonsoulin, but Mr. Gallier, whose wife is not a party to this suit and who was called as a witness for defendant, does not corroborate that testimony. However that may be, it was made known, in the course of the year (1908), that the old gentleman intended to sell the place to the defendant, and several witnesses testify that they were told, either by him or by defendant, that, in making the sale, his" right of usufruct was to be reserved. Mr. E. S. Broussard, *742 one of the counsel for defendant, gives the following testimony on that subject, to wit:
“Homer Gonsoulin was my mother’s brother. On several occasions, before the taking of the inventory of the succession of Odile Prince, my uncle sent word to me asking me to go and see him, and I visited the plantation, and he explained to me that some of his children were demanding a settlement from him of the amounts that he had received from their mother, and instructed me to have an inventory made in order to arrive at what basis he should settle with them. The petition, filed on August 7, 1908, in this succession and offered in evidence, merely prays for an inventory, because that was his only desire, to find out what was coming to them, to settle. * * * In order to realize the money which this inventory showed was due by him, my uncle, Homer Gonsoulin, stated to me and to'several other parties with whom he consulted that he would be compenea to sell this land, but that he didn’t want to leave his home, and that, when he sold it, he would reserve the right to remain on the property until his death. It was understood that I was to draw up a will to be executed by Antoine, in favor of his father, because Antoine was about to be married, and Antoine suggested that, if his death should occur before the death of his father, it might complicate matters; and, before this sale, it was agreed that Mr. Homer Gonsoulin was to retain the property up to his death, and that will was made to secure him in case of the death of Antoine. The sale was passed, as I remember, on an election day, and, for that matter, I deferred the making of the will until, as shown by the will, on the 5th of September, four days after, when I made it and mailed it to Antoine, who copied it and brought me his will, which was deposited in his box in the New Iberia National Bank.”
To which we may add that the original draft of the will and the original will, copied therefrom, were offered in evidence and show that defendant thereby left to his father the usufruct for life of the property in question.
The act of sale was signed by the parties on September 1, 1908, and purports to convey the 109 arpents of land to the defendant for $2,186 in cash, but, according to the evidence, that amount was arrived at by taking into account the debt of $1,000, secured by mortgage on the property, which was due to defendant, with interest, and which was thereby extinguished, together with some small amounts that were paid in cash; the balance, of say $3,062, being left in the hands of the defendant, as the representative of the vendor, to be used in paying the debt due by the latter to the heirs of his wife. The act contains no reference, whatever, to any reservation of usufruct by the vendor; nor do we find in the record any explanation of the omission. As a matter of fact, the vendor remained upon the property and collected such revenues as it yielded, up to the date of his death, which took place on June 2, 1910; the defendant and his wife residing there, also, and the expenses of the establishment being shared in equal proportions, save that defendant paid the taxes and the wages of the cook. There is considerable conflict in the testimony of the witnesses concerning the value of the land at that time, but defendant’s witnesses do not, taking their testimony together, place it lower than $30 an arpent, and plaintiffs’ witnesses, disinterested persons, living in the neighborhood, say that it was worth from $40 to $50 an arpent, and their testimony finds some corroboration in the actual sales that were made about that time. Upon the whole, our conclusion is that the land was reasonably worth $40 an arpent. Several of the witnesses testify, in answer to questions as to what they would have been willing to pay for the property, with the condition that the vendor should retain the usufruct for life, that they would not have entered into such an arrangement, save, perhaps, with a parent. The attending physician and neighbor of Mr. Gonsoulin gives the following testimony in regard to his age and physicial condition at that time:
“He was past 70, I suppose. Q. What was his trouble at that time? A. Organic heart disease. Q. Was his condition critical? A. It was. Q. Was his condition known to this son, Antoine, who was living with him? A. I think it was. * * * Q. Did you talk to Antoine Gonsoulin about his father’s health? A. Yes, sir; because it was Antoine that I usually spoke to. He was the one who usually sent for me. Q. You acquainted him with his fa *744 ther’s condition, didn’t you? A. Yes, I think I did. Q. Was it not apparent to you and to Antoine Gonsoulin that the old gentleman’s life was a short one from that time on? A. It was to me, of course. Q. Was it not to his son Antoine, from your statements to him, didn t you make that known to him? A. Very likely I did, but I cannot swear that I told him. * * * Q. And his health continued bad up to the time of his death? A. Yes, very poor; he would improve, at times, and, at times, would get worse again; he was suffering from a dropsical condition and, when it was relieved, of course be was better. Q. And he finally died of this same trouble for which you were treating him? A. Yes, sir.”
Opinion.
[1-3] The title of the property in question, as it appeared upon the public records, was transferred to the defendant, free of any usufruct or other incumbrance in favor of his father, and could have been so transferred, at any time, by the vendee, or, under execution, at the suit of his creditor. And so the last will of the defendant, purporting to secure such usufruct during the life of his father, remained entirely under the control of the maker, and, if not destroyed by him, would have been affected by the condition of Ms estate at the time of his death, as compared with the number of his forced heirs. Whilst therefore we entertain no doubt of the good faith of the defendant in the matter of allowing his father to retain the usufruct of the property in question, the situation was such that he was bound to nothing in that respect, and we are of opinion that the transaction here in question should be dealt with solely with reference to the moneyed consideration. That consideration was, we think not more than half the value of the property, at the date of the sale; and, if we should add the value of the usufruct for the period which intervened between the date of the sale and that of the death of the usufructuary, it would still leave the price of the property a low one. It is said that the usufructuary might have lived for years, but, in the opinion of his attending physician and to the knowledge of the defendant, the' probability was that he would live but a short time. On the other hand, whilst defendant appears to be successful in his business, misfortune might have overtaken him and the property might have been sold under execution for the payment of his debts; so that he and the vendee each took his chance, and the balance was not so greatly in favor of the vendor as to entitle it to consideration in determining the adequacy vel non of the price received by him. It is argued on behalf of defendant that plaintiffs are estopped by reason of their having received the proceeds of the property in payment of the amounts due them from the succession of their mother and grandmother. But they received those amounts from, their father and grandfather, in payment of a debt due by him, and are not, thereby, estopped to demand collation from the defendant because the money represented the price of property sold to him, at a low price, by his father. It is said, also,- that plaintiffs, having accepted the succession of their father and grandfather, are warrantors of defendant’s title. But a good many of the plaintiffs are minors, for whom the succession was accepted under benefit of inventory; Apart from that, however, the acceptance of a succession cannot deprive the heirs of the right to demand collation of each other, since collation is an incident to partition, and heirs who undertake to partition an estate thereby accept it. It may be said, then, that this action is premature, since no action in partition has been instituted. The proceedings in the succession of Homer Gonsoulin, however, show that, after payment of the debts, there was but $18.56 left, which balance, so far as we are informed, has not been distributed; and, as the law abhors a multiplicity of actions, we are of opinion that this may be regarded as in the nature of a partition proceeding, *746 It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment decreeing the defendant to be the owner of the property here in dispute and described in the act of sale, from Homer Gonsoulin to Antoine Gonsoulin, before J. E. Prince, notary public, on September 1, 1908, subject to his obligation to collate with respect to the difference between the value of the property and the value of the consideration received therefor by the vendor, plus the taxes paid by the vendee and the expenses disbursed or incurred by him in the improvement of said property, in proportion to the increase in value which it has received thereby. It is further decreed that, should the defendant elect to make the collation in kind, he be allowed, by preference, in the partition, from the proceeds of the property, the sum of $2,186, with interest at the rate of 8 per cent, per annum on $1,000 thereof from September 1, 1908, until June 2, 1910, and at the rate of 5 per cent, per annum on the balance of said amount between said dates, and that he be further allowed all amounts expended by him in the payment of taxes on said property and all expenses disbursed or incurred in the improvement of said property to the extent of the increase in value resulting therefrom. It is further decreed that, should the defendant elect, within 30 days from the date upon which this judgment shall become final, to collate by taking less, his right to retain said property be recognized upon his paying to the plaintiffs herein their respective shares in the sum of $2,180 with legal interest from judicial demand, after deducting therefrom said taxes and expenses — being the difference, less said taxes and expenses, between the price paid for said property and its value at the date of the opening of the succession of Homer Gonsoulin. It is further decreed that this ease be remanded to the district court for the ascertainment of the amounts that may be due to defendant for taxes and expenses and for such further proceedings as may be necessary in the execution of this decree; the defendant to pay all the costs, incurred in this proceeding up to this time.